1

2

3

4

5              UNITED STATES DISTRICT COURT

6              EASTERN DISTRICT OF WASHINGTON

7   In Re:                              NO:  CV-11-362-RMP

8   LLS AMERICA, LLC,
                                        Bankr. Case No. 09-06194-PCW11
9                      Debtor,          (Consolidated Case)

10  BRUCE P. KRIEGMAN, solely in his    Adv. Proc. No. 11-80093-PCW11
    capacity as court-appointed Chapter 11
11  Trustee for LLS America, LLC,       FINDINGS OF FACT AND
                                        CONCLUSIONS OF LAW
12                      Plaintiff,

13  v.

14  0720878, BC LTD., et al.,

15                      Defendants.

16
        This case was tried before the Court from December 9, 2013, through
17
    December 11, 2013.  The Court heard the testimony of the parties' witnesses,
18
    reviewed the admitted exhibits, and is fully informed.  Plaintiff, Bruce P.
19
    Kriegman, the court-appointed Chapter 11 Trustee for LLS America, LLC
20

FINDINGS OF FACT AND CONCLUSIONS OF LAW ~ 1

("Trustee"), was represented by Thomas Cochran, Shelley Ripley, Samuel Thilo, and Richard Mount.

Attorney Dillon Jackson appeared for his clients, David Dill, Kevin Dill, Lillian Dill, Tracey Dill, Robert Dill, Jr., Robert Dill, Sr., and Lilrob Ltd, but informed the Court that his clients had instructed him not to participate in the trial. The Court denied Jackson's request to be excused from trial because trial was scheduled to begin, but allowed Jackson to participate via telephone after the first day of trial. The Court repeatedly invited Jackson to participate in cross examination of Plaintiff's witnesses, to make arguments or call witnesses, and to respond to events during trial, but Jackson did not participate on behalf of these clients other than to reiterate their demand that he not take part in the proceedings.

Attorneys Gregg Smith and Terrance Keenan appeared on behalf of Defendants Alex Mirrow and Save It, LLC.

Defendants Paul and Diane Cooper did not appear through counsel or pro se or participate in this trial, although they were given sufficient notice in advance of the trial date.

The Court makes the following findings of fact and conclusions of law:

**PREVIOUS RULINGS**

1.    **Ponzi scheme and Insolvency**

On July 1, 2013, the Bankruptcy Court issued its Report and Recommendation Re Plaintiff's Motion for Partial Summary Judgment on Common Issues ("Report and Recommendation") recommending that the District Court grant the Trustee's Amended Motion for Partial Summary Judgment on two "Common Issues": (1) Debtor operated a Ponzi scheme; and (2) Debtor was insolvent at the time of its transfers to Defendants.  On August 19, 2013, this Court adopted the Bankruptcy Court's Report and Recommendation and entered an Order granting the Trustee's Amended Motion for Partial Summary Judgment on the Common Issues ("Order Adopting Report and Recommendation").  *See* District Court Case No. 12-CV-00357, ECF No. 92.  Therefore, this Court has determined that Debtor operated a Ponzi scheme and was insolvent at the time of each of the transfers to Defendants.

All of the findings and conclusions set forth in the Report and Recommendation and the Order Adopting Report and Recommendation are hereby incorporated.

1    **2.    Extraterritorial Application**

2    On October 16, 2013, this Court entered an Order Denying Motion to

3    Dismiss Claims and to Exclude Canadian Transactions.  ECF No. 148.  All of the

4    findings and conclusions set forth in that Order are hereby incorporated.

5    <center>**GOOD FAITH**</center>

6    Transfers made in furtherance of a Ponzi scheme constitute actual fraud

7    under the Bankruptcy Code and Washington's version of the Uniform Fraudulent

8    Transfer Act (UFTA).  *See* Bankr. Adv. Doc. 11-80299, ECF No. 378 at 21-25.

9    "Where causes of action are brought under the UFTA against Ponzi scheme

10   investors, the general rule is that to the extent innocent investors have received

11   payments in excess of the amounts of principal that they originally invested, those

12   payments are avoidable as fraudulent transfers."  *Donell v. Kowell*, 533 F.3d 762,

13   770 (9th Cir. 2008).

14   Here, Defendants do not dispute that they are obligated to pay Plaintiff

15   amounts that they received from Debtor that exceed their investment in the

16   scheme.  Defendants assert, however, that they are entitled to retain the amount of

17   principal that they invested because they acted in good faith.

18   A transferee of a fraudulent transfer may keep funds that it took for

19   reasonably equivalent value and in good faith.  *See* 11 U.S.C. § 548(c); RCW

20   19.40.081(a).  As recipients of transfers that constitute actual fraud, the burden of

proof in establishing the affirmative defense of good faith is on Defendants. *In re Agricultural Research and Technology Group, Inc.*, 916 F.2d 528, 535 (9th Cir. 1990); 5 COLLIER ON BANKRUPTCY ¶ 548.09[2][c] at 548-98.2 (16th ed. 2011).

Although "good faith" is not defined precisely in case law, at least one court has noted that the absence of good faith is shown by a transferee who knows that a debtor is operating a Ponzi scheme. *See In re Agricultural Research*, 916 F.2d at 535 (citing *In re Independent Clearing House*, 77 B.R. 843, 861 (D. Utah 1987)). The Ninth Circuit has quoted favorably an explanation in an early case that a transferee's "knowledge or actual notice of circumstances sufficient to put him, as a prudent man, upon inquiry as to whether his brother intended to delay or defraud his creditors . . . should be deemed to have notice . . . as would invalidate the sale as to him." *Id.* at 535 (quoting *Shauer v. Alterton*, 151 U.S. 607, 621 (1894)).

Thus, courts measure good faith by an objective standard, looking to what a transferee "'knew or should have known' in questions of good faith, rather than examining what the transferee actually knew from a subjective standpoint." *Id.* at 536.

Considering Defendants' assertions that they participated in the Ponzi scheme with *actual* good faith and the likelihood that many of the scheme's victims will raise the same defense as the adversarial proceedings are litigated, the Court finds that it is important to stress the policy behind avoiding fraudulent

transfers.  The goal of avoiding a debtor's fraudulent transactions is not to punish those who received funds from the debtor.  Instead, fraudulent transfers are avoided to benefit a debtor's creditors by bringing property back into the debtor's estate for distribution to creditors.  5 COLLIER ON BANKRUPTCY ¶ 548.01[1][a] at 548-11.  Under the Bankruptcy Code, Washington's UFTA, as well as relevant case law, the Court does not contemplate a recipient's intent when deciding whether to avoid fraudulent transfers.  *Id.* ¶ 548.04[2] at 548-63; *Thompson v. Hanson*, 168 Wn.2d 738, 749 (2010).  Accordingly, a transfer that constitutes actual fraud is avoided in its entirety unless the transferee establishes that a reasonable person in the transferee's position would not and should not have known of the fraud, not simply whether he or she *actually* acted in good faith.

### FINDINGS OF FACT

1.     Debtor is the Little Loan Shoppe group of companies, which was originally formed in 1997.

2.     Over the course of its existence, Debtor acquired approximately $137 million from investments made by individual investors and documented by means of promissory notes offering interest in the range of 40% to 60% annual interest. Ex. 2 at 19.

3.     Defendants are lenders who received payments from Debtor.

4.      Debtor issued approximately $65 million in payday loans, both through storefront businesses and through internet operations.

5.      Debtor accumulated payday loan bad debts of approximately $29 million, which were written off in 2009.  Ex. 2 at 68.

6.      Debtor was never profitable at any time during its existence.  Ex. 2 at 20.

7.      Debtor gave lenders, including Defendants, post-dated checks to cover interest payments, but some checks had insufficient funds to cover payment of the checks or no longer had an active account with the drawee bank when the date for payment arrived.

8.      Debtor voided approximately 29,000 of the post-dated checks it had issued to lenders, including Defendants.

9.      All Defendants were given not sufficient funds ("NSF") checks or received post-dated checks that were voided by Debtor.

10.     All Defendants received promissory notes that were rolled into or renewed in other promissory notes to avoid the repayment of the original note.

11.     Debtor operated as a Ponzi scheme, whereby investors' loans were sometimes used to pay other investors' promised returns on investments.

12.     All of the transfers that the Trustee seeks to avoid were made within the period of September 1997 to July 21, 2009.

FINDINGS OF FACT AND CONCLUSIONS OF LAW ~ 7

13.    Indicia and characteristics of the Ponzi scheme present in this case include:

    a.    Proceeds received from new investors masked as profits from running a payday loan business;

    b.    Promises of a high rate of return on the funds between 40% to as much as 60% and, even on occasion, 75%, Ex. 2 at 19;

    c.    Debtor paid commissions to third parties who solicited new lenders, generally 10% per annum of the amount received from the new lender, Ex. 2 at 95;

    d.    Debtor solicited funds as loans evidenced by promissory notes but demonstrated a pattern of "rolling over" the promissory notes when due onto new notes instead of paying off the obligation;

    e.    Debtor, throughout its history, made false and misleading statements to current and potential investors; and

    f.    Debtor was insolvent from its inception to the filing of its bankruptcy.

14.    Mr. Gargiulo, an attorney, provided advice to Debtor.  Mr. Gargiulo had access to Debtor's books and records.

FINDINGS OF FACT AND CONCLUSIONS OF LAW ~ 8

15.     The court-appointed examiner, Charles B. Hall, by way of education, experience, and vocation, is qualified to analyze and review the legitimacy of enterprise operations to detect a fraud based on Ponzi scheme operations.  The Court finds that Mr. Hall's testimony was credible.

16.     The Court finds that Curtis Frye's testimony, which pertained to Debtor's record keeping and the accounting of investments, payments, and commissions to Defendants, was credible.

17.     Specific findings of fact for each Defendant are as follows:

    **a.     Paul and Diane Cooper**

        1.     Paul Cooper recruited 269 lenders.  Ex. 2 at 96.

        2.     Mr. Cooper not only recruited lenders, he stepped into the role of administrator of the Ponzi scheme, became a business advisor to Debtor, and prepared, composed, or edited letters from Doris Nelson to other Lenders.

        3.     All acts by Mr. Cooper were for the benefit of Mr. and Ms. Cooper.

        4.     Mr. and Ms. Cooper invested $78,540 in Debtor.  Ex. 108 at 9.

        5.     Mr. Cooper received commissions in the amount of $1,225,000 from Debtor.  Ex. 104 at 3.

6.    Mr. Cooper received additional commissions through self-help remedies in the amount of $250,000.  Ex. 3.

7.    Mr. and Ms. Cooper received interest and principal payments from Debtor.

8.    Transfers to Mr. and Ms. Cooper total $2,799,426.  Ex. 108 at 9.

9.    Mr. and Ms. Cooper did not file a proof of claim in Debtor's bankruptcy.

10.    Mr. and Ms. Cooper did not attend trial, participate at trial, or offer any evidence; thus, they have not met their burden of establishing that they acted in good faith.

**b.    Alex Mirrow, Save It, LLC, and A & A Rocky Mountain Enterprises**

Alex Mirrow began investing with Debtor in December 2005 by making loans through Save It, LLC.  Ex. 2 at 106.  At trial, Mr. Mirrow testified that he is the sole owner of Save It, LLC and was the sole owner of A & A Rocky Mountain Enterprises at the time that he invested in Debtor.[1]  Exhibits and Mr. Mirrow's

---

[1] A & A Rocky Mountain Enterprises is not a named defendant, but in his proposed conclusions of law, Mr. Mirrow writes that he, Save It LLC, and A & A Rocky Mountain Enterprises "acted as a single defendant," ECF No. 186 at 7.  Furthermore, in his trial brief, Mr. Mirrow states that he "is the sole member of Save It LLC and A & A Rocky Mountain Enterprises, LLC (defunct company)."  ECF No. 185 at 3 n.3.  Mr. Mirrow clarified during trial that A & A Rocky

FINDINGS OF FACT AND CONCLUSIONS OF LAW ~ 10

testimony indicate that he controlled both companies during the dates at issue in this case and that he requested Debtor to make payments in his own name and in the names of Save It, LLC, and A & A Rocky Mountain Industries.

Plaintiff contends that Mr. Mirrow invested $824,980.00 in Debtor and received credits from Debtor in the amount of $1,367,177.33. Ex. 3; Ex. 47. Plaintiff argues that neither Mr. Mirrow, Save It, LLC, nor A & A Rocky Mountain Industries is eligible for the good faith defense and that this Court should find them jointly and severally liable. *See* Ex 47 at 1. Plaintiff supports its conclusions regarding the amounts loaned and received by Mr. Mirrow, Save It, LLC, and A & A Rocky Mountain Enterprises through introduction of Debtor's bank statements, returned checks or check stubs, reports of wire transfers, and testimony by Mr. Hall and Mr. Frye.

Mr. Mirrow agrees that he invested $825,000 in Debtor, but the parties dispute whether an additional $200,000 transfer constitutes an investment in Debtor. Mr. Mirrow contends that he invested funds with Debtor by sending $200,000 to Mr. Cooper at Debtor's direction. Mr. Cooper intended to use the money for a separate business, but Debtor issued Mr. Mirrow a promissory note for the loan in Debtor's name. *See* Ex. 202 at 9-10. Plaintiff contends that there is no evidence that Debtor benefitted in any way from the $200,000 payment to Mr.

Mountain Enterprises is not defunct, but that he transferred all of his interest out of the company on January 1, 2013.

Cooper and, therefore, the Court should not consider the $200,000 payment in the accounting of Mr. Mirrow.

Whether Mr. Mirrow should be credited for the $200,000 investment, however, is immaterial if Mr. Mirrow fails to establish the defense of good faith. Thus, the Court first considers whether Mr. Mirrow met the objective standard of good faith such that he would be allowed to keep the amount that he invested in Debtor.

Mr. Mirrow argues that, out of this group of defendants, he performed the greatest amount of due diligence before investing in Debtor. Mr. Mirrow testified that he visited Spokane in 2005, met with Ms. Nelson, toured the payday loan facility, and watched as employees completed transactions over the internet. Mr. Mirrow also requested financial documentation from Debtor and was shown a purported 2005 profit and loss statement, which includes a notation that the amounts were estimated. *See* Ex. 201.

However, Mr. Mirrow did not wait to review finalized financial statements before investing, reinvesting, and recruiting others to invest in Debtor. In fact, Mr. Mirrow testified that he never received a finalized financial statement for 2005 or for any other year, despite repeated requests.

FINDINGS OF FACT AND CONCLUSIONS OF LAW ~ 12

At least one of Mr. Mirrow's requests for financial information stemmed from his efforts to convince other people to invest.  In an email dated April 19, 2006, Mr. Mirrow wrote the following:

> Everyone is asking for financials or tax returns on the company.  We have plenty of money promised from major investors however they are all withholding until I can get them the info.  We should make them sign a confidentiality and non-disclosure agreement before we provide that.  They are all willing to sign.  Please ask your attorney to provide one immediately as these are fairly standard and he should have one on file or can create one in an hour or so.  Also please ask the accountant to provide a financial statement or last years [sic] tax returns right away.  Tomorrow we should have the 200k into the Wells Fargo acct.  We would have had it today except that the major investor that committed to it backed out when we couldn't provide the financials.

Ex. 2 at 171.  Debtor's continued failure to provide definite financial information should have alerted Mr. Mirrow to the possibility that the investment scheme was not legitimate.

At trial, Mr. Mirrow indicated that he did not have formal training or education to understand the significance of not receiving financial information before investing large sums of money.  However, even if Mr. Mirrow would not have fully understood the intricacies of a financial statement, the fact that "the major investor that committed to it backed out when we couldn't provide the financials[,]" Ex. 2 at 171, provided constructive notice to Mr. Mirrow that a reasonable and prudent investor would not have been involved with Debtor without reviewing such documentation.

FINDINGS OF FACT AND CONCLUSIONS OF LAW ~ 13

Moreover, Mr. Mirrow's emails from as early as 2005 support the conclusion that Mr. Mirrow was in fact a sophisticated investor who knew or should have known of the fraudulent nature of Debtor's enterprise. Mr. Mirrow was aware of the need to include language in agreements to protect investors from the possibility of losing their money in the event that Ms. Nelson died or divorced and he knew of the risk of lawsuits against payday loan companies. Ex. 37 at 3. Mr. Mirrow wrote to Mr. Cooper in a 2005 email that "I understand that currently the District Attorney of Colorado is going after pay day advance company's [sic] just like [Debtor] that operate in Colorado. . . . Remember, in some states like Colorado the penalty for violation of usury laws is LOSS OF THE PRINCIPLE!!! [sic]." Ex. 37 at 3. *See also* Ex. 2 at 106-117 (summary of Mr. Mirrow's communications with Debtor). Even Mr. Mirrow's use of the term "usury laws" in the email indicates a level of financial knowledge.

A 2007 email from Mr. Mirrow to Debtor reflects both Mr. Mirrow's sophistication and his involvement in structuring Debtor's notes, including a specific suggestion regarding issuing new notes to former investors: "At the bottom, we cannot cancel all previous notes since when people lend more money in the future we will give them another note. The language as it is would then cancel the notes we are now issuing. Only you, I and Paul know the loan numbers

FINDINGS OF FACT AND CONCLUSIONS OF LAW ~ 14

of the old notes so we need to specify the old loan numbers and amounts of the

loans being cancelled."  Ex. 37 at 52.

In an email dated January10, 2008, Mr. Mirrow stated that he had become

frustrated with Debtor's refusal to use commercial lending and had contacted

another banker who assured him that, contrary to Debtor's assertions, commercial

lending to a payday loan company "was no problem legally and even directed [Mr.

Mirrow] to the govt. website for proof." Ex. 2 at 181.  Despite this indication that

Debtor had misrepresented a significant fact about the business, Mr. Mirrow closed

the email by stating that someone wanted to invest more money and that Mr.

Mirrow wanted to share with Debtor his ideas of how to structure the future notes.

Ex. 2 at 181.

Later in 2008, Mr. Mirrow emailed to Debtor:

Dee:

Pls take what I say very seriously.  You have now lost all credibility and can
only gain it back by complete transparency.  If you want to have the least
amount of problems be sure that all the investors want the veil of secrecy
removed and will want clear unambiguous answers to the following:
     1.  Has LLS been profitable and if so for how long?
     2.  What went wrong
     3.  How will it be corrected and how long will it take
     4.  What measures are taken to make sure that we are operating
       completely in harmony with all laws wherever we operate.

Ex. 217 at 1.

FINDINGS OF FACT AND CONCLUSIONS OF LAW ~ 15

To support his good faith defense, Mr. Mirrow relies on his lack of formal education and his testimony that he purchased a book about payday loan companies and talked to its author.  In addition, Mr. Mirrow testified that he asked an attorney, Mr. Bennett Bayer, to "throw mud" at Debtor's business plan and "poke holes" in it, but Mr. Mirrow testified that he never stopped participating in Debtor's business even when Debtor failed to follow up with Mr. Bayer by providing the financial materials that Mr. Bayer needed and requested or signing Mr. Bayer's retainer agreement.

Mr. Mirrow's significant involvement with Debtor provided him with sufficient notice of its fraudulent nature.  Mr. Mirrow was active in recruiting other investors for Debtor and was credited with having brought in at least 52 new investors and $18 million.  Ex. 2 at 96, 180.  Plaintiff submitted evidence that Mr. Mirrow received up to $53,000 per month in commissions.  Ex. 2 at 113; Ex. 37 at 137.  Mr. Mirrow also worked with Debtor to create and edit solicitation and general letters.

No later than 2008, Mr. Mirrow knew, or should have known, that Debtor was actually a Ponzi scheme and not a profitable business.  However, Mr. Mirrow knew, or should have known, much earlier of the fraudulent nature of Debtor's enterprise and of the transfers that he received as a result of it.

The Court finds that Mr. Mirrow has not established that he acted under an objective standard of good faith when he received transfers from Debtor.  The Court further finds:

           1.      Mr. Mirrow used his personal residence to receive mail sent by Debtor for Save It, LLC and for A & A Rocky Mountain Enterprises.  Ex. 37 at 34.

           2.      Mr. Mirrow used accounts for both A & A Rocky Mountain Enterprises and Save It, LLC to receive funds from Debtor.  Ex. 37 at 34.

           3.      Defendant Alex Mirrow and Save It, LLC, a company wholly owned by Mr. Mirrow, and A & A Rocky Mountain Enterprises, a business that was wholly owned by Mr. Mirrow at the time in question, all received some monies from Debtor and all acted as a single defendant.

           4.      Mr. Mirrow, personally, invested no funds in Debtor.

           5.      Save It, LLC invested $824,980 in Debtor.  Ex. 40 at 4.

           6.      A & A Rocky Mountain Enterprises invested no funds in Debtor.

           7.      Save It, LLC received payments and commissions (excluding self-help commissions) from Debtor in the amount of $852,164.51.  Ex. 47.

FINDINGS OF FACT AND CONCLUSIONS OF LAW ~ 17

1      8.     Save It, LLC received additional commissions through

2   self-help remedies in the amount of $250,000.  Ex. 3; Ex. 47.

3      9.     Mr. Mirrow received payments and commissions from

4   Debtor in the amount of $139,256.29.  Ex. 47.

5      10.    A & A Rocky Mountain Enterprises received payments

6   and commissions from Debtor in the amount of $125,756.53.  Ex. 47.

7      11.    Transfers to Mr. Mirrow, Save It, LLC, and A & A

8   Rocky Mountain Enterprises total $1,367,177.33.

9      12.    Mr. Mirrow filed a proof of claim in Debtor's

10  bankruptcy under Claim No. 512, and Save It, LLC filed a proof of claim in

11  Debtor's bankruptcy under Claim No. 513.

12      **c.     David Dill**

13      1.     David Dill invested $550,000 in Debtor.  Ex. 70 at 3;

14  Ex. 71 at 3.

15      2.     David Dill received commissions in the amount of

16  $156,510.17 from Debtor.  Ex. 70 at 3.

17      3.     David Dill received a total of $1,454,462 as interest and

18  principal payments from Debtor.  Ex. 70; Ex. 75 at 13; *see* Ex. 76.

19      4.     Transfers to David Dill total $1,610,972.

20

FINDINGS OF FACT AND CONCLUSIONS OF LAW ~ 18

5.      David Dill filed a proof of claim in Debtor's bankruptcy under Claim No. 129.  Ex. 71.

6.      David Dill did not appear at trial, participate at trial, or offer any evidence; thus he has not met his burden of establishing that he acted in good faith.

**d.      Robert Dill, Jr. and Tracey Dill**

1.      All acts by Mr. Robert Dill, Jr. were for the benefit of Robert Dill, Jr. and Tracey Dill.

2.      Robert Dill, Jr. and Tracey Dill invested $350,000 in Debtor.  Ex. 10 at 4.

3.      Robert Dill, Jr. received commissions in the amount of $90,502 from Debtor.  Ex. 17 at 2.

4.      Robert Dill, Jr. and Tracey Dill received a total of $319,699.55 as interest and principal payments from Debtor.

5.      Transfers to Robert Dill, Jr. and Tracey Dill total $410,201.55.  Ex. 13 at 5.

6.      Robert Dill, Jr. and Tracey Dill filed a proof of claim in Debtor's bankruptcy under Claim No. 602.  Ex. 11.

7.      Robert Dill, Jr. and Tracey Dill did not appear at trial, participate at trial, or offer any evidence; thus, they have not met their burden of establishing that they acted in good faith.

    **e.      Kevin Dill**

1.      Kevin Dill invested $775,000 in Debtor.  *See* Ex. 65 at 12-13; Ex. 60 at 1.

2.      Kevin Dill received commissions in the amount of $8,666.58 from Debtor.  Ex. 67 at 1.

3.      Kevin Dill received a total of $2,337,328.66 (including commissions) from Debtor.  Ex. 60 at 4.

4.      Kevin Dill filed proofs of claim in Debtor's bankruptcy under Claim Nos. 73 and 490.  *See* Ex. 61.

5.      Kevin Dill did not appear at trial, participate at trial, or offer any evidence; thus he has not met his burden of establishing that he acted in good faith.

    **f.      Robert Dill, Sr. and Lillian Dill and LilRob Ltd.**

1.      All acts by Mr. Robert Dill, Sr. were for the benefit of Robert Dill, Sr. and Lillian Dill.

2.      Robert Dill, Sr., Lillian Dill and LilRob, Ltd., jointly and severally, invested $350,000 in Debtor.  *See* Ex. 20 at 3, Ex. 21 at 2.

FINDINGS OF FACT AND CONCLUSIONS OF LAW ~ 20

3.     Robert Dill, Sr., Lillian Dill and LilRob, Ltd., jointly and severally, received commissions in the amount of $116,049.30.  Ex. 28 at 2.

4.     Robert Dill, Sr., Lillian Dill and LilRob, Ltd., jointly and severally, received $814,135.35 as interest and principal payments from Debtor.

5.     Transfers to Robert Dill, Sr., Lillian Dill and LilRob, Ltd. total $930,184.65.  Ex. 23 at 9.

6.     Robert Dill, Sr., Lillian Dill and LilRob, Ltd. filed a single, joint proof of claim in Debtor's bankruptcy under Claim No. 776. Ex. 21 at 2.

7.     Robert Dill, Sr., and Lillian Dill did not appear at trial, participate at trial, or offer any evidence; thus, they have not met their burden of establishing that they acted in good faith.

8.  LilRob, Ltd. appeared at trial through his counsel, Mr. Dillon Jackson, who was instructed by LilRob, Ltd. not to participate at trial or offer any evidence; thus, LilRob, Ltd. did not meet its burden of establish that it acted in good faith.

1

**CONCLUSIONS OF LAW**

2        1.      This Court has jurisdiction of this proceeding pursuant to 28 U.S.C. §

3  1334 and 28 U.S.C. § 157(d) as this is a core proceeding.

4        2.      This Court has jurisdiction over all Defendants.

5        3.      This action was timely commenced.

6        4.      At least one unsecured creditor existed who triggered the strong arm

7  power of 11 U.S.C. § 544(b)(1), because the creditor did not and should not

8  reasonably have discovered the fraudulent nature of Debtor's Ponzi scheme

9  transfers less than one year before the bankruptcy petition was filed.

10        5.      Washington State law governing fraudulent transfers applies.  *See*

11  ECF No. 148 at 3 (noting that the relevant conduct largely occurred in Spokane,

12  Washington).

13        6.      Under the statutes relating to fraudulent transfers, 11 U.S.C. § 548

14  and RCW 19.40, *et seq.*, payments received from Debtor are recoverable from

15  each Defendant by Plaintiff, subject to the defense of good faith pursuant to RCW

16  19.40.081(a).

17        7.      Under RCW 19.40.041(a)(1), RCW 19.40.091(a) and the "strong arm

18  powers" that 11 U.S.C. § 544(b)(1) grants to bankruptcy trustees, all Debtor's

19  transfers to Defendants, regardless of the date of transfer, are hereby set aside and

20  avoided.

FINDINGS OF FACT AND CONCLUSIONS OF LAW ~ 22

8.    Transfers made by Debtor in furtherance of its Ponzi scheme are transfers made with actual intent to hinder, delay and/or defraud creditors under both state law, RCW Ch. 19.40, and federal law, 11 U.S.C. § 548(a)(1).

9.    The Trustee is entitled to claw back and recover all transfers to Defendants.

10.    The Trustee is entitled to repayment of all commissions without any right of off set.

11.    Each Defendant failed to meet his or her burden to establish good faith and, thus, each Defendant is required to return the entire amount of the transfers that he or she received, including principal, interest, and commissions.

12.    Plaintiff requests pre-judgment interest at Washington's statutory rate of 12% from the date of each transfer.  The award of pre-judgment interest is left to the discretion of the trial court.  *In re Acequia, Inc.*, 34 F.3d 800, 818 (9th Cir. 1990).  The Court finds that pre-judgment interest is appropriate to more fully compensate Debtor's creditors, but Plaintiff's request is excessive.  Instead, the Court awards Plaintiff pre-judgment interest at the applicable federal rate from July 21, 2009, when the bankruptcy case commenced.

13.    Pursuant to 11 U.S.C. § 548(a), 544, 550, and 551, and RCW 19.40.041(1) and 19.40.071, the Trustee is entitled to, and is granted a judgment for, the benefit of the Liquidating Trust of Debtor against **Paul and Diane**

**Cooper**, jointly and severally, in the amount of **$2,799,426** plus pre-judgment interest from July 21, 2009, at the applicable federal rate and post judgment interest at the federal judgment rate from the date of judgment to the date the judgment is paid in full, *see* 28 U.S.C. § 1961.

14.    Pursuant to 11 U.S.C. § 548(a), 544, 550 and 551, and RCW 19.40.041(1) and 19.40.071, the Trustee is entitled to and is granted a judgment for the benefit of the Liquidating Trust of Debtor against **Alex Mirrow and Save It, LLC**, jointly and severally, in the amount of **$1,367,177.33** plus pre-judgment interest from July 21, 2009, at the applicable federal rate and post judgment interest at the federal judgment rate from the date of judgment to the date the judgment is paid in full.

15.    Pursuant to 11 U.S.C. § 548(a), 544, 550 and 551, and RCW 19.40.041(1) and 19.40.071, the Trustee is entitled to, and is granted a judgment for, the benefit of the Liquidating Trust of Debtor against **David Dill**, in the amount of **$1,610,972** plus pre-judgment interest from July 21, 2009, at the applicable federal rate and post judgment interest at the federal judgment rate from the date of judgment to the date the judgment is paid in full.

16.    Pursuant to 11 U.S.C. § 548(a), 544, 550 and 551, and RCW 19.40.041(1) and 19.40.071, the Trustee is entitled to, and is granted a judgment for, the benefit of the Liquidating Trust of Debtor against **Robert Dill, Jr. and**

**Tracey Dill**, jointly and severally, in the amount of **$410,201.55** plus pre-judgment interest from July 21, 2009, at the applicable federal rate and post judgment interest at the federal judgment rate from the date of judgment to the date the judgment is paid in full.

17.    Pursuant to 11 U.S.C. § 548(a), 544, 550 and 551, and RCW 19.40.041(1) and 19.40.071, the Trustee is entitled to, and is granted a judgment for, the benefit of the Liquidating Trust of Debtor against **Kevin Dill**, in the amount of **$2,337,328.66** plus pre-judgment interest from July 21, 2009, at the applicable federal rate and post judgment interest at the federal judgment rate from the date of judgment to the date the judgment is paid in full.

18.    Pursuant to 11 U.S.C. § 548(a), 544, 550 and 551, and RCW 19.40.041(1) and 19.40.071, the Trustee is entitled to, and is granted a judgment for, the benefit of the Liquidating Trust of Debtor against **Robert Dill, Sr. and Lillian Dill and LilRob, Ltd.**, jointly and severally, in the amount of **$930,184.65** plus pre-judgment interest from July 21, 2009, at the applicable federal rate and post judgment interest at the federal judgment rate from the date of judgment to the date the judgment is paid in full.

19.    The Trustee is entitled to post judgment interest.

20.    The Trustee is entitled to reimbursement of its costs.

FINDINGS OF FACT AND CONCLUSIONS OF LAW ~ 25

21.    All proofs of claim filed by any Defendants in Debtor's Bankruptcy proceedings or any claims that may hereafter arise are hereby disallowed pursuant to 11 U.S.C. § 502(d) unless and until the avoided transfers are returned to the Trustee.

22.    Defendants' claims are equitably subordinated.  "Equitable subordination requires that (1) the claimant who is to be subordinated has engaged in inequitable conduct; (2) the misconduct results in injury to competing claimants or an unfair advantage to the claimant to be subordinated; and (3) subordination is not inconsistent with bankruptcy law."  *Paulman v. Gateway Venture Partners III, L.P.* (*In re Filtercorp, Inc.*), 163 F.3d 570, 583 (9th Cir. 1998) (quoting *Spacek v. Thomen* (*In re Universal Farming Indus.*), 873 F.2d 1334, 1337 (9th Cir. 1989)) (internal quotation marks omitted).

The Court concludes that the conduct of Defendants was inequitable in that they recruited new investors without properly investigating the significant signs that Debtor's business was illegitimate.  This misconduct injured the investors who contributed large sums of money to the Ponzi scheme and inflated Defendants' commission payments.  Accordingly, all proofs of claim of Defendants that may hereafter arise or that have been filed or brought or that may hereafter be filed or brought by, on behalf of, or for the benefit of any of Defendants or their affiliated entities, against Debtor's estate, in Debtor's

1    bankruptcy or related bankruptcy proceedings are subordinated to all other

2    unsecured claims, pursuant to 11 U.S.C. Sections 510(c)(1) and 105(a);

3        23.    Trustee is awarded all applicable interest allowed against each

4    defendant.

5        The District Court Clerk is directed to enter this Order and provide copies

6    to counsel, to pro se defendants, and to Judge Frederick P. Corbit.

7        DATED this 30th day of December 2013.

8

9            _____*s/ Rosanna Malouf Peterson*_____
             ROSANNA MALOUF PETERSON
10           Chief United States District Court Judge

11

12

13

14

15

16

17

18

19

20

FINDINGS OF FACT AND CONCLUSIONS OF LAW ~ 27